# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DARRYL JOHN SUTTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 10 C 08137 |
| PARTHASARATHI GHOSH, and WEXFORD | ) | |
| HEALTH SOURCES, INC. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Darryl John Sutton, brings suit under § 1983 alleging that defendants Dr. Parthasarathi Ghosh and Wexford Health Sources, Inc. ("Wexford") acted with deliberate indifference by repeatedly failing to renew or refill his Ibuprofen prescription to treat his degenerative joint disease. Sutton was without Ibuprofen for a total of 90 days during the August 2010 to March 2011 period. Resp. at 3, Dkt. 171. Defendants Ghosh and Wexford move for summary judgement. For the following reasons, the motion is granted.

## BACKGROUND[1]

Ghosh is a doctor who served as the medical director for Stateville Correctional Center ("Stateville") from 2003 until March 31, 2011. DSOF ¶ 3. Some of Ghosh's responsibilities as medical director included running the 32-bed infirmary, reviewing the records of patients needing offsite medical referrals, treating Stateville patients referred directly to him by another provider, serving as the around-the-clock emergency contact, participating in quality assurance

---

[1] The Court takes the following facts from Ghosh and Wexford's Statement of Material Facts ("DSOF") (Dkt. 161), where undisputed, from Sutton's Response to Ghosh and Wexford's Statement of Material Facts ("P Resp.") and Statement of Additional Facts ("PSOF") (Dkt. 170), and Ghosh and Wexford's Response to Sutton's Statement of Additional Facts ("D Resp.") (Dkt. 176).

studies of the Healthcare Unit ("HCU"), and running the specialty clinics (*i.e.* the HIV and hepatitis-C clinics). DSOF ¶ 3. Wexford is a private entity that contracts with IDOC to provide medical care to the inmates incarcerated at the Illinois Department of Corrections ("IDOC") correctional centers in Illinois, including at Stateville. DSOF ¶ 4. As medical director at Stateville, Ghosh was an employee of Wexford. PSOF ¶ 3.

Wexford's operating policies have a section on "Access to Care," which states the "responsible health authority for the facility"—which at Stateville is Ghosh, the medical director—"will ensure the timely and efficient response to all inmates' health care needs." D Resp. ¶ 28. Wexford also has "Pharmacy Policies and Procedures" which state, "There will be procedures developed to ensure that . . . patients receive prescribed medications within a reasonable time after being filled by subcontracted pharmacy services." P Resp. ¶ 6. Stateville has its own policies regarding health care in the Offender Handbook, which states that medical technicians are the "first contact an offender has if he is sick, injured or needs follow-up care." PSOF ¶ 16.

Prisoners at Stateville can obtain prescription medications either when a medical provider writes a new prescription or the inmate turns in a refill sticker from an existing prescription to medical staff. DSOF ¶ 7. The prescription or refill sticker is sent to the on-site pharmacy at Stateville for processing from existing stock or is forwarded to the Wexford pharmacy for fulfillment.[2] DSOF ¶ 7. According to an IDOC representative, if an inmate follows the procedure of submitting his refill sticker before he has less than a week's worth of medication, the inmate would typically receive the refill in two to three days. DSOF ¶ 8. Inmates also make oral requests directly to Correctional Medical Technicians ("med techs") for medication refills. DSOF ¶ 11.

---

[2] Wexford contracts with Boswell Pharmacy Services for fulfillment of the pharmaceutical needs at all of the IDOC centers. DSOF ¶ 7 n.4.

To renew a prescription after the exhaustion of authorized refills, an inmate must schedule a sick-call appointment with a medical provider. DSOF ¶¶ 9-10. There are a number of ways an inmate can request a sick-call appointment, including asking a med tech directly, placing a note in the sick-call box located on each cell block, or writing a letter to the HCU or to the medical director. P Resp. ¶ 15; *see also* DSOF Ex. E at 38:11–39:16. Ghosh had no personal involvement in overseeing the medical appointment process, P Resp. ¶ 17, but he had the authority to schedule medical appointments. PSOF ¶ 5. An inmate must request sick-call with enough notice, "preferably three to seven days before his medication is set to expire," to permit time to schedule the appointment and process the new prescription and to avoid a delay in receiving his mediation. DSOF ¶ 9. When prescription medication is distributed, it is noted in the inmate's medication administration record ("MAR"). DSOF ¶ 13.

Due to the volume of correspondence addressed to Ghosh and pursuant to IDOC policy, Ghosh did not review every letter that was addressed to him as the medical director. P Resp. ¶ 20. Rather, HCU staff would review the letters addressed to Ghosh, address the issues raised by each inmate, and only consult Ghosh if necessary. P Resp. ¶ 20. If Ghosh personally reviewed a letter, he usually would place a note in the inmate's medical records and counter-sign the letter.[3] P Resp. ¶ 20. Ghosh admits that he had a duty to ensure that inmates received medical treatment, and Ghosh, along with the HCU administrator, had ultimate responsibility to make sure inmates received their prescription medications on a timely basis. D Resp. ¶ 4; *see also* DSOF Exs. C at 50:23–51:2 and D at 51:9-13.

---

[3] Sutton points out that his medical file contains a letter addressed to Ghosh, dated July 28, 2009, that was not counter-signed per Ghosh's usual practice, "thereby disputing that Dr. Ghosh has such a 'custom and practice.'" P Resp. ¶ 20. However, Sutton does not claim or provide evidence that Ghosh personally reviewed this letter. Therefore, this is not evidence that Ghosh did not always follow his usual practice.

Sutton has been incarcerated in the IDOC since 1991 and has been at Stateville since 2003. DSOF ¶ 1. Sutton receives prescription medication for the following ailments: degenerative joint disease ("DJD"), diabetes, high blood pressure, high cholesterol, and acid-reflux disease. DSOF ¶ 2. Sutton received regular treatment for his diabetes, high blood pressure, high cholesterol, and acid-reflux disease, including clinics every three to four months where Sutton would see a doctor and have his medications renewed. DSOF ¶ 28. The only disease for which Sutton alleges that Stateville medical personnel failed to provide medication is his DJD. DSOF ¶ 2. Sutton did not have any problems receiving his medication from 2004 through mid-2010; his allegations of delay begin in August of 2010. DSOF ¶ 32.

Sutton's DJD was first diagnosed over two decades ago and causes him to suffer pain in his back, hips, knees, neck, and shoulder. PSOF ¶ 1. Sutton is not alleging that his DJD went completely untreated; he acknowledges that he has received treatment for his DJD including prescription pain medication, x-rays, an MRI, a back and knee brace, physical therapy, analgesic balm, and medical permits assigning him to a low-gallery and low-bunk. DSOF ¶ 29. The prescription medication Sutton received for his DJD consisted of Ibuprofen (prescription strength pain medication) as well as the muscle relaxants Robaxin and Flexeril. P Resp. ¶ 30. Sutton takes the maximum permissible number of prescription painkillers per day to treat his DJD. PSOF ¶ 15.

Sutton testified that he followed the same procedure to request pain medication prescriptions and refills: "[d]ays before a prescription expired or a refill was needed, [he put] the refill sticker in the Healthcare Request Box or [gave] the sticker to a Medical Technician" or wrote "to Medical Technicians and doctors." PSOF ¶ 17. While Sutton stated that he "usually always [goes] days before" his medication ran out, there "might have" been a situation where he

was completely out of pills before he notified medical staff of his need for a refill. DSOF Ex B. Sutton Dep. at 53:11-16. Beyond Sutton's testimony that it was his routine to request refills of his Ibuprofen prescription before his supply ran out, the record does not include other evidence of Sutton's efforts to request refills by scheduling sick-call appointments or requesting refills by submitting refill stickers in the Healthcare Request Box.

Sutton's problems accessing his Ibuprofen began in mid-2010; he received a six-month prescription for Ibuprofen on February 5, 2010, that was set to expire on August 4, 2010. DSOF ¶ 34. A med tech delivered 28 tablets of Ibuprofen on July 22, 2010.[4] DSOF ¶ 34. On July 23, 2010, Sutton complained to a med tech about a bump on his right shoulder and scheduled a sick-call appointment for July 27, 2010. DSOF ¶ 35. At that appointment, Sutton complained of neck pain and a growth in his neck to physician's assistant ("PA") La Tanya Williams; he did not inform Williams that his Ibuprofen prescription was about to expire nor did he request a renewal of that prescription at that appointment. DSOF ¶ 37.

Sutton was without a valid Ibuprofen prescription from August 4, 2010, through September 8, 2010—a 34-day lapse ("Lapse 1"). On August 17, 2010, a med tech delivered Sutton's prescriptions for his other ailments; Sutton could have asked these med techs for assistance in refilling his Ibuprofen subscription.[5] DSOF ¶¶ 38-39. Sutton's letters to his counselor, the wardens, and medical personnel, however, consistently reflect Sutton's statements that, before it expired on August 4, 2010, he had been making numerous requests to see a doctor

---

[4] The prescription instructed that Sutton could take up to 2 tablets per day; thus 28 tablets would last 14 days if he took the maximum dosage. Resp. at 4; *see also* DSOF Ex. H at SUT01127.

[5] It is undisputed that Sutton *could* have asked these med techs for assistance refilling his Ibuprofen prescription. DSOF ¶¶ 38-39. The record is not clear whether he did so. *See* DSOF ¶¶ 38-40. Taking the evidence in the light most favorable to the non-moving party—Sutton—the Court assumes that Sutton handed these med techs one of the many letters he noted in his September 2, 2010, grievance. *See* Sec. Am. Compl. Ex. E.

to have his prescription renewed.[6] *See, e.g.*, Sec. Am. Compl. Exs. E; F; H at 1-2; I; J, Dkt. 50. Nothing in the record sheds any further light on the question of why, if he was requesting to see a doctor during this period, Sutton was unable to do so.

On September 2, 2010, Sutton filed a grievance with his correctional counselor, Cleopatra Johnson, claiming that "when he requested a renewal for his Ibuprofen prescription by writing letters to the med techs and to the HCU, he did not receive a sick call appointment in response." DSOF ¶ 40. The parties do not dispute that this grievance and the many letters Sutton says he wrote regarding Lapse 1 did not mention Ghosh nor were they addressed to Ghosh. DSOF ¶ 40. The grievance form merely asked for a "Brief Summary of Grievance" with no dedicated field to identify individuals. D Resp. ¶ 24. Before receiving a response to his grievance, Sutton attended his regularly scheduled diabetes and high blood pressure clinic on September 3, 2010. DSOF ¶ 41. Sutton saw Dr. Schaefer and complained that his Ibuprofen prescription had expired; Dr. Schafer wrote Sutton a one-month prescription for Ibuprofen and told him to submit a sick-call request to see a doctor for his DJD prescription renewal. DSOF ¶ 41. On September 7, 2010, counselor Johnson responded to Sutton's grievance by stating that Sutton "will need to see the doctor in order to have [his Ibuprofen prescription] renewed." DSOF ¶ 42.

On September 8, 2010, a med tech delivered Sutton's 30-day supply (90 tablets; 3 tablets per day) of Ibuprofen, per Dr. Schaefer's prescription.[7] DSOF ¶ 43. Shortly thereafter, on

---

[6] Defendants do not contest that Sutton had repeatedly made requests to see a doctor and to have his Ibuprofen prescription renewed. Although the many letters Sutton refers to are not in the record, the Court will accept as true for the purposes of summary judgment that Sutton repeatedly sent letters and made requests for medical attention throughout the August 2010 to March 2011 period, as stated in his various letters and grievances.

[7] Defendants again note that when the med techs delivered Sutton's other medications on September 14, 2010, and September 17, 2010, that Sutton *could* have requested his DJD

September 15, 2010, Sutton wrote to the Grievance Officer to appeal Johnson's response to his September 2, 2010, grievance. DSOF ¶ 44. Sutton sent a letter dated September 20, 2010, stating that he never received a follow-up appointment for his neck mass; PA Williams scheduled a sick-call appointment for September 22, 2010. DSOF ¶ 45. At that appointment, Dr. Schaefer addressed the neck mass and, when Sutton requested an Ibuprofen renewal, Dr. Schaefer advised "that he would be seen for one problem at a time" and refused to refill the Ibuprofen prescription. DSOF ¶ 46. Again, other than Sutton's testimony about his normal practice, there is no other evidence in the record showing whether Sutton made any further attempt after he saw Dr. Schaefer to schedule a sick-call appointment for the purpose of getting his Ibuprofen prescription refilled.

Sutton ran out of Ibuprofen on October 7, 2010, and was without this medication until October 20, 2010—a period of 12 days ("Lapse 2"). Resp. at 4; *see also* DSOF ¶¶ 43, 51. On October 13, 2010, Sutton filed an emergency grievance to the warden's office complaining: (1) that he had been having more pain than usual in his neck due to his DJD; (2) that although he did as he had always done when his prescription was about to expire on August 4, 2010—"sent a request to the healthcare unit, by placing a note in the healthcare request box here in the cell house, and [telling] the medical technician's (sic) that came on the galleries in the mornings and evenings to pass out medications to inmates"—he still had not had his Ibuprofen prescription renewed; (3) that Dr. Schaefer did not refill his prescription at the September 22, 2010, appointment and that he still had not seen a doctor since then; and (4) that counselor Johnson responded to his September 23, 2010, grievance against Dr. Schaefer, noting "talked to Inka, med records director and she stated that you (sic) name will be submitted to the med tech's (sic)

---

medication; the record, however, does not indicate whether or not Sutton asked for a prescription renewal at those times. P Resp. ¶ 43 n.9.

for consideration," yet he still had not seen a doctor. *See* P Resp. ¶ 47; Sec. Am. Compl. Ex. H at 1-3. The only mention of Ghosh in this grievance was to inform the warden that Ghosh could vouch for the fact that Sutton was diagnosed with DJD. DSOF ¶ 48. Warden Hardy denied the emergency grievance on October 19, 2010, without any explanation. DSOF ¶ 49.

Sutton first wrote directly to Ghosh on October 16, 2010, to complain that he had not received an Ibuprofen renewal and, despite his numerous requests to have his prescription renewed, he still had not been seen by a doctor for his DJD and was in pain as a result. DSOF ¶ 50; PSOF ¶ 18. PA Williams wrote Sutton a one-month prescription for Ibuprofen on October 18, 2010, and a med tech delivered the medication on October 20, 2010.[8] P Resp. ¶ 51. That same day, Sutton wrote a letter to Assistant Warden Darryl Edwards informing him that he had requested an Ibuprofen prescription renewal "by writing requests to the HCU, handing requests to the med techs, putting the requests in the boxes in his cell house, writing grievances, and by complaining to his counselor," who advised Sutton to write to the assistant warden. DSOF ¶ 52; *see also* Sec. Am. Compl. Ex. J. A week later, on October 28, 2010, Sutton appealed Hardy's denial of his emergency grievance to the Administrative Review Board, citing his concern that future Ibuprofen prescription renewals would be untimely. DSOF ¶ 53.

Sutton wrote a letter to "Med tech's/Doctor Ghosh" on November 3, 2010, explaining:

---

[8] The parties dispute whether PA Williams received the October 16, 2010, letter addressed to Ghosh. The defendants assert that Sutton's letter to Ghosh "was routed by the HCU to PA Williams." DSOF ¶ 51. Sutton notes that the record defendants cite does not support defendants' assertion, P Resp. ¶ 51, but the defendants rely on the evidence that this was the standard procedure at Stateville; this evidence is admissible under Federal Rule of Evidence 406, which provides in relevant part that "evidence of . . . an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice." For his part, Sutton does not offer contrary evidence or even another hypothesis to explain why Williams wrote the requested prescription two days after Sutton sent the letter to Ghosh.

> I have been trying to be seen by Doctor Ghosh for over 3-months now, for pain in my neck in the spinal area, headaches on the left side of my head, and I am having a harder time walking from my degenerative joint disease in my hips. The med tech's (sic) that I have talked to about these issues of my pain have told me that I have to see Doctor Ghosh. I have not been able to get any response in any of my many other routes of trying to get help for my pain, and therefore I am asking to please be seen by Doctor Ghosh about my degenerative joint disease pain that is getting worse and the more than usual headache pain.

PSOF Ex. 15.

On November 8, 2010, Sutton complained to his counselor that he had not received medical treatment for his neck pain despite sending numerous requests to the med techs and the HCU. DSOF ¶ 54. Johnson responded on November 9, 2010, noting that there was no documentation in Sutton's medical records of a diagnosis of Degenerative Joint Pain, and that he had been scheduled for an appointment with Ghosh on November 12, 2010. DSOF ¶ 54. Sutton received his sick-call pass two days prior to the appointment, on November 10, 2010. DSOF ¶ 54. Rather than see Ghosh, however, Sutton saw PA Williams at the November 12, 2010 appointment.[9] DSOF ¶ 55. When Sutton inquired as to his appointment with Ghosh, Williams reviewed his records, informed him that he had no pending appointment to see Ghosh, and scheduled an appointment with Ghosh on November 30, 2010. DSOF ¶ 55.

In the meantime, Sutton's prescription expired on November 18, 2010, and he wrote to the med tech ("Ms. Wendy") that day, requesting a renewal of his medication until he saw

---

[9] Defendants again note that Sutton "could have requested to have his medication renewed by PA Williams at this appointment." DSOF ¶ 56. The record does not reveal whether Sutton asked to renew his prescription and was denied or whether he did not ask. Based on his experience at the September 22, 2010 appointment with Dr. Schaefer, where Sutton was advised that he would be seen for one problem at a time, Sutton may have noted the futility of asking to address a different problem than the one for which he had an appointment (the appointment was for Sutton's neck pain). Furthermore, the med techs and Sutton's counselor had informed Sutton that he needed to see Ghosh. *See* PSOF Ex. 15; DSOF ¶ 42.

Ghosh. DSOF ¶ 57. Williams wrote Sutton a new three-month prescription for Ibuprofen the same day, and a med tech delivered the Ibuprofen on either November 20 or 21, 2010.[10] P Resp. ¶ 57.

Sutton finally saw Ghosh on November 30, 2010. DSOF ¶ 58. Ghosh examined Sutton, ordered an MRI of Sutton's cervical spine (which took place at the University of Illinois at Chicago Medical Center on January 26, 2011), prescribed Neurontin in case the MRI revealed a neurological issue, and renewed Sutton's low-gallery, low-bunk permits. DSOF ¶ 58. Dr. Ghosh did not prescribe Ibuprofen, presumably because Sutton had just received a three-month prescription about ten days earlier. On December 2, 2010, Sutton saw PA Williams but noted that no treatment was necessary because he had seen Ghosh the previous week. DSOF ¶ 59.

Sutton's fourth lapse in medication lasted nine days, from December 20 through December 30, 2010 ("Lapse 4"). *See* Resp. at 4; DSOF ¶¶ 57, 60. Med techs delivered a 30-day provision of Ibuprofen on December 30, 2010, and 60 additional tablets on January 27, 2011. DSOF ¶ 60. Sutton ran out of Ibuprofen on February 17, 2011, which began a 33-day lapse in medication ("Lapse 5"). *See* Resp. at 4. Again, there is no documentary evidence of what efforts Sutton made to have his prescription refilled during this period. Sutton had various other medications delivered throughout December 2010 and January 2011, at which time Sutton could have made an oral or written request to the med techs for Ibuprofen. DSOF ¶ 60 n.11.[11]

---

[10] The page of the medical records that both parties cite to support each of their assertions that Sutton received the medication on either November 20 or 21, 2010, is not clearly marked. *See* DSOF Ex. H at SUT01134. Either day is a plausible reading of the record.

[11] The medical records contain two additional letters from Sutton addressed, "To: med tech's, For Doctor Ghosh" dated December 19, 2010, and December 30, 2010. *See* DSOF Ex. H SUT00046-47. The letters address Sutton's complications with the Neurontin prescription. Neither party highlighted these letters that Sutton sent Ghosh, presumably because they do not concern Sutton's difficulties with his Ibuprofen prescription.

Grievance Officer Colleen Franklin denied Sutton's appeal of his September 2, 2010, grievance on February 18, 2011. D Resp. ¶ 25. She noted that in the time the appeal was pending, Sutton had received two prescriptions for Ibuprofen, had seen Ghosh regarding his neck pain, and had an MRI; Franklin concluded that the "issue appears to be addressed. NO ACTION" but also noted that the grievance would be forwarded to various administrators for "review of the current medication renewal process." D Resp. ¶ 25; Sec. Am. Compl. Ex. G.

On March 17, 2011, Sutton wrote Ghosh a letter, informing him that his Ibuprofen prescription had expired on February 18, 2011, and that, in addition to awaiting a response on his many requests for prescription renewal, he had been waiting for a follow-up appointment to discuss the results of the MRI. D Resp. ¶ 20; *see also* Sec. Am. Compl. Ex. Q. Ghosh saw Sutton the next day, on March 18, 2011, where he discussed the results of Sutton's MRI and prescribed the muscle relaxant Flexeril for three months for Sutton's neck pain and Motrin (the brand name version of Ibuprofen). P Resp. ¶ 61; DSOF Ex. H at SUT00509. According to the medication administration records, Sutton received 30 tablets (1-2 tablets every 8 hours) of Ibuprofen on March 23, 2011. PSOF ¶ 13. There is no evidence of record as to why Ibuprofen was not provided to Sutton until five days after the appointment. Sutton heard back from the Administrative Review Board and Director on June 17 and 20, 2011, respectively, denying his September 2, 2010, grievance on the merits. PSOF ¶ 26.

Although Sutton alleges a number of other instances in 2011 where he did not receive Ibuprofen, for reasons that are explained *infra*, those facts are not at issue because Ghosh retired on March 31, 2011. Reply at 4. At his deposition, Ghosh stated that he has no recollection of Sutton ever telling him about his difficulties renewing or receiving medication, nor does Ghosh recall receiving Sutton's letters dated October 16, 2010, November 3, 2010, or March 17, 2011.

DSOF ¶ 21. Sutton has no knowledge whether Ghosh received the three letters he addressed to Ghosh. DSOF ¶ 21.

The chronology of Sutton's complaints about his difficulties obtaining Ibuprofen can be summarized as follows:

| Date Provided | No. of Tabs | Maximum Frequency | Date Supply Depleted | First Notice of Problem | Ghosh Notified? |
|---|---|---|---|---|---|
| 7/22/2010 | 28 | 2 tablets / day | 8/4/2010 | 9/2/10 Grievance | No |
| **34-day lapse** | | | | | |
| 9/8/2010 | 90 | 3 tablets / day | 10/7/2010 | 10/13/10 Grievance | 10/16/10 Letter |
| **12-day lapse** | | | | | |
| 10/20/2010 | 90 | 3 tablets / day | 11/18/2010 | 11/18/10 Note to Med Tech | No |
| **2-day lapse** | | | | | |
| 11/21/2010 | 90 | 3 tablets / day | 12/20/2010 | No evidence | No |
| **9-day lapse** | | | | | |
| 12/30/2010 | 90 | 3 tablets / day | 1/28/2011 | N/A | N/A |
| 1/27/2011 | 60 | 3 tablets / day | 2/17/2011 | 3/17/11 | 3/17/11 |
| **33-day lapse** | | | | | |
| 3/23/2011 | 30 | 6 tablets / day | 4/1/2011 | Post-Ghosh's 3/31/11 retirement | |

Sutton also alleges that Wexford has a number of polices that unconstitutionally condone medication lapses: (1) a policy to ignore medication lapses; (2) a policy of improper cost cutting; and (3) an absence of procedures to ensure timely medication delivery. Resp. at 19-20. Sutton relies on the testimony of Dr. Anton Dubrick, a staff physician at Stateville and Wexford employee from November 2011 through May 2012 (a period after Ghosh left), that there were

significant problems at Stateville in distributing medication to inmates. PSOF ¶ 35. Dubrick testified, "Wexford is cheap . . . all healthcare providers . . . if they could save a dime, even though it would seem crazy to us on the bottom, they would." D Resp. ¶ 39; PSOF Ex. 4 Dubrick Dep. at 127:15-21. Dubrick also stated that he did not think Wexford's cost cutting efforts were reasonable or safe, although he cautioned that he was not an expert, did not claim to have any special privilege or knowledge, and that his standards might be different than other people's and might be unreasonable. D Resp. ¶ 39; PSOF Ex. 4 at 126:18-23.

Sutton filed suit on December 21, 2010, against a number of IDOC and Wexford personnel. The Second Amended Complaint ("SAC"), which is the operative complaint, claims deliberate indifference to medical needs by a number of IDOC and Wexford parties: Warden Marcus Hardy, Brian Fairchild, S.A. Godinez, Colleen Franklin, Cleopatra Johnson, Ghosh, and Wexford. The parties stipulated to the dismissal with prejudice of defendants Hardy, Fairchild, Godinez, Franklin, and Johnson on November 16, 2012. Dkt. 88. The only remaining defendants are Ghosh and Wexford. Defendants filed a motion for summary judgment on April 3, 2014, claiming that the undisputed facts demonstrate that Ghosh was not deliberately indifferent to Sutton's medical needs and that there is no evidence that Wexford had a policy of cost-cutting. The case was transferred to this Court from Judge Nordberg on May 15, 2014.

## DISCUSSION

Sutton alleges deliberate indifference under § 1983, in violation of the Eighth and Fourteenth Amendments, against Ghosh and Wexford for the repeated lapses in providing or prescribing Ibuprofen to treat his DJD. To prevail on their summary judgment motion, the defendants must demonstrate that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding Ghosh and

Wexford's motion for summary judgment, the Court construes all disputed facts and draws all reasonable inferences in favor of Sutton, the nonmoving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). Summary judgment is only appropriate when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id*. Based on the record before the Court, defendants' motion is granted.

## I.    Exhaustion

Defendants claim that Sutton failed to exhaust his administrative remedies, in violation of the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. § 1997e(a). Before filing suit, an inmate must properly utilize the prison grievance procedures in order to "[allow prisons] to address complaints about the program it administers before being subjected to suit, [reduce] litigation to the extent complaints are satisfactorily resolved, and [improve] litigation that does occur by leading to the preparation of a useful record." *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011) (*quoting Jones v. Bock,* 549 U.S. 199, 219 (2007)) (brackets in original). Failure to exhaust is an affirmative defense with the burden of proof on the defendants. *Id*. at 720.

Ghosh and Wexford have not met their burden to establish that Sutton failed to exhaust the available administrative remedies. The defendants claim that Sutton failed to exhaust because his grievances did not name Ghosh or Wexford specifically. Mem. in Supp. at 2, Dkt. 163. This argument is directly contrary to Seventh Circuit precedent. In *Maddox*, a case the defendants did not cite in their opening motion or in reply, the Seventh Circuit explained:

The Illinois Administrative Code requires that the grievance "contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint." 20 Ill. Admin. Code § 504.810(b). If names of individuals are unknown to the offender, he can still file the grievance, but "must include as much descriptive information about the individual as possible." *Id.* . . . Maddox filed his grievance on a prison form [that] only asked for a "Brief Summary of Grievance"; there was no indication on the form that names had to be provided.

*Maddox*, 655 F.3d at 721. As in *Maddox*, the grievance forms Sutton filed only contained a section requiring a brief summary of the grievance, without requiring the names of specific individuals or entities. *See* Sec. Am. Compl. Exs. E, H. Sutton thoroughly described his complaints on the forms, which were rejected on the merits (not for any procedural deficiency) both at the initial review and upon Sutton's appeal to the Administrative Review Board. *See* Sec. Am. Compl. Exs. G, K, S; *Watkins v. Lancor*, 558 F. App'x 662, 665 (7th Cir. 2014) (*quoting Maddox*, 655 F.3d at 722) ("Where [prison] officials 'address an inmate's grievance on the merits without rejecting it on procedural grounds, the grievance has served its function of alerting the state and inviting corrective action, and defendants cannot rely on the failure to exhaust.'").

Defendants make no other arguments that Sutton failed to comply with Stateville's grievance procedure and failed to offer any reply to the Sutton's invocation of *Maddox*. Because Sutton's grievance served its intended role of notifying prison administrators of his complaints, he properly exhausted administrative remedies.[12]

---

[12] The Court concurs as well with Sutton's argument that the defendants forfeited any exhaustion defense by failing to assert it until after the completion of fact discovery. As the Seventh Circuit noted in *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008), in the ordinary case, resolution of any exhaustion issue should precede merits discovery and ruling. *See also Wagoner v. Lemmon,* 778 F.3d 586, 588 (7th Cir. 2015) (reemphasizing that "a proper *Pavey*

## II. Medication Lapses Post-March 31, 2011 and Robaxin Lapses

Sutton's complaint alleges that Ghosh and Wexford deprived him of Ibuprofen on a number of occasions between August 2010 and December 2011. However, Sutton's response to summary judgment only argues about the five lapses between August 2010 and March 2011, before Ghosh retired. Because Sutton failed to respond to defendants' arguments regarding the lapses that allegedly occurred after Ghosh's retirement, he has waived those arguments. *See Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the [plaintiff has] done here—results in waiver."). The same is true of the alleged Robaxin lapses; because Sutton's response makes no argument as to those alleged lapses, this argument, too, has been waived. Summary judgement is granted to both Ghosh and Wexford on the claims relating to medication lapses post-March 31, 2011 and on all claims related to Robaxin.

## III. Dr. Ghosh

Section 1983 provides a cause of action for persons who, under color of law, are deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Liability under § 1983 requires personal responsibility; a supervisory official satisfies this requirement "if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (internal citations and quotations omitted).

---

hearing should be conducted *before* an adjudication on the merits"); *Jones v. Grubman*, No. 06-0330, 2009 WL 3049216, at *2 (S.D. Ill. Sept. 18, 2009) (holding failure to develop exhaustion defense constituted waiver despite having pleaded the defense in the answer).

The Eighth Amendment, as incorporated through the Fourteenth Amendment, imposes a duty on states "to provide adequate medical care to incarcerated individuals." *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013) (*quoting Johnson v. Doughty,* 433 F.3d 1001, 1010 (7th Cir. 2006)). Prison officials violate this duty "if they display deliberate indifference to serious medical needs of prisoners." *McGee*, 721 F.3d at 474 (*quoting Johnson*, 433 F.3d at 1010). To state a claim for deliberate indifference, Sutton must prove: (1) that he has an objectively serious medical need, one that has "been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention," *Gomez v. Randle,* 680 F.3d 859, 865 (7th Cir. 2012); and (2) that the defendants were aware of his serious condition and were deliberately indifferent to it. *See McGee*, 721 F.3d at 481. To establish the subjective element of deliberate indifference, Sutton must show more than negligence but need not show that the officials intended or desired to cause him harm. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Courts have equated deliberate indifference with recklessness: "the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

### A. Serious Medical Need

The parties do not dispute that Sutton was diagnosed with DJD over two decades ago and that, as a result, he suffers "pain in his back, hips, knees, neck, and shoulder." PSOF ¶ 1. Sutton testified regarding his symptoms when he is not taking Ibuprofen:

> Well, sometimes when I walk, my hip it is like sharp pains inside the joint with each step it is hard to walk. My lower back, it hurts to where sometimes I can't sleep. My knees, sometimes they just— it will just pop and go out; and, my neck is constant pain and headaches; and, my shoulders is pain to where I lift my arms over my head in any way, or even like when I twist my arms when we are put into shackles. . . . Sometimes [ ] I can't walk to the chow hall for meals because my hip hurts so bad that I can't walk, and then, therefore, I can't climb the stairs to get to or from my cell. I can't do a lot of walking basically. Sometimes I can't sleep because my back and hip hurt so bad that it keeps me woke. Headaches comes sometimes to where, you know, it's hard for me to basically read or anything like that because they get so bad that my vision is blurred.

Mem. in Supp. Ex. B at 32:17–33:2, 74:7-20. Sutton's undisputed testimony establishes that his condition causes him severe pain when left untreated.[13] The Seventh Circuit has explained that a medical need is serious if failure to treat the condition could result in "wanton infliction of pain" and has noted indications of a serious medical need: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008). Sutton's DJD is a documented medical condition that leaves him in substantial pain when not taking Ibuprofen; it significantly hinders his ability to engage in the daily activities of walking to his meals, reading, or sleeping due to his pain. These undisputed facts satisfy the objective element of "serious medical need."

---

[13] Sutton submits the opinions of a medical expert, Dr. Najia Shakoor, regarding Sutton's pain experience. *See* PSOF ¶ 2. Defendants object to Dr. Shakoor's opinions as improper legal conclusions. *See* D Resp. ¶ 2. Because Sutton's undisputed testimony is sufficient to establish a serious medical need, the Court need not address Dr. Shakoor's opinions.

**B.     Deliberate Indifference**

Sutton must next demonstrate that a reasonable trier of fact could conclude that Ghosh was "subjectively aware of [Sutton's] serious medical condition and either knowingly or recklessly disregarded it." *Hayes*, 546 F.3d at 524. The evidence in the record, even viewed in a light most favorable to Sutton as the non-moving party, does not support a conclusion that Ghosh knew of, and disregarded, the repeated instances in which Sutton had not been provided with Ibuprofen despite his chronic pain.

Based on the chronology of Sutton's complaints about delays in refilling or renewing his Ibuprofen prescription, there is no evidence that Ghosh received notice of any problems Sutton was experiencing in that regard until Sutton wrote to him on October 16, 2010.[14] Plainly, then, Ghosh had no knowledge of Lapse 1, which concluded on September 8, 2010. Sutton did not write the October 16, 2010, letter to Ghosh until 9 days into the 12 days of Lapse 2. Two days after writing the letter, PA Williams wrote Sutton a prescription for Ibuprofen, which he received two days later. This timeframe demonstrates that the HCU promptly responded to Sutton's complaint and, to the extent that it gives rise to any inference about the intent of Ghosh, or others, it suggests that they responded promptly to Sutton's complaint.

Sutton's second letter to Ghosh, dated November 3, 2010, preceded the subsequent Lapses and did not mention any problems receiving prescription medication; rather, it noted his increased pain from DJD and his desire to see Ghosh for an appointment. Whether Ghosh received and reviewed this letter or not has no bearing on Sutton's complaints of medication lapses. Nor does the record contain any evidence that Ghosh had notice of the few days that constituted Lapse 3; Sutton requested a prescription from a med tech on November 18, 2010, the

---

[14] The Court is assuming, for the purposes of summary judgment, that Ghosh received and reviewed Sutton's three letters.

day his medication expired, and received the Ibuprofen one or two days later. Not only is Ghosh not responsible for this Lapse of which he had no knowledge, but as to this Lapse, Sutton acknowledges both that he failed to comply with the procedure of requesting medication at least three to seven days before expiration and that his prescription was promptly filled once he notified a med tech.

Sutton had an appointment with Ghosh on November 30, 2010, but there is no evidence in the record that Sutton complained about medication problems at this appointment. Nor is there evidence that Sutton requested an Ibuprofen prescription at this appointment, likely because he had recently received a valid three-month prescription from PA Williams. Sutton did not write to Ghosh during Lapse 4, and there is no evidence explaining what, if any, actions Sutton took during this Lapse or what prompted the December 30, 2010, refill.

Sutton wrote the March 17, 2011, letter to Ghosh 28 days into the 33 days of Lapse 5. Ghosh saw Sutton the very next day and prescribed the muscle relaxant Flexeril for Sutton's neck pain and Motrin. Sutton received Ibuprofen (a generic substitute for the brand name Motrin) on March 23, 2011, five days later.

The record is devoid of evidence that Ghosh had any notice of Lapses 1, 3, or 4. For the two Lapses of which Ghosh had notice via Sutton's letters, Ghosh or another HCU staff member addressed the complaint within a few days; these incidents do not establish that Ghosh was deliberately indifferent to whether Sutton was receiving appropriate pain medication. Moreover, the time lag between Sutton notifying Ghosh and Sutton receiving his medication—at most, four days during Lapse 2 and five days during Lapse 5—are *de minimis*, and for "a *de minimis* level of imposition, [ ] the Constitution is not concerned." *See Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (*quoting Ingraham v. Wright,* 430 U.S. 651, 674 (1977)) ("In

determining whether an imposition is *de minimis*, it is appropriate to evaluate both its severity and its duration.").

While the record contains evidence of Sutton's numerous letters and grievances addressed to other IDOC or Wexford personnel regarding medication delays, there is no evidence that Ghosh was subjectively aware of those complaints and could, therefore, have been deliberately indifferent to Sutton's needs. Although this relieves Ghosh of liability under § 1983, it highlights the same problem the Seventh Circuit addressed in *Shields v. Illinois Dep't of Corr.*:

> The problem [an inmate] faces is that the remedial system that has been built upon § 1983 by case law focuses primarily on individual responsibility. Under controlling law, as a practical matter, [an inmate] must come forward with evidence that one or more specific human beings acted with deliberate indifference toward his medical needs. Shields has not been able to do so. The Illinois Department of Corrections and its medical services contractor, Wexford, diffused responsibility for Shields' medical care so widely that Shields has been unable to identify a particular person who was responsible for seeing that he was treated in a timely and appropriate way. Several of the individual defendants employed by Wexford were aware of portions of Shields' course of treatment, but no one person was responsible for ensuring that Shields received the medical attention he needed. No one doctor knew enough that a jury could find that he both appreciated and consciously disregarded Shields' need for prompt surgery.

746 F.3d 782, 785-86 (7th Cir. 2014) *cert. denied*, 135 S. Ct. 1024 (2015).

The same can be said of Sutton's situation: various med techs, PAs, and doctors were aware of Sutton's medical needs but nevertheless he experienced a number of problems obtaining pain relief medication. And assuming, as the Court must for purposes of this summary judgment motion, that Sutton followed his claimed routine of timely submitting refill requests in accordance with required procedures, Sutton has a viable argument that there was a systemic problem in refilling his prescriptions; assuming that he did timely request the refills, he should not have experienced the delays that he endured. But because Ghosh was not personally and

directly responsible for all of Sutton's treatment, there is insufficient evidence for a jury to find that he was personally and directly responsible for the lapses in Sutton's Ibuprofen refills, much less that he was deliberately indifferent to their occurrence. *See Ford v. Wexford Health Sources, Inc.*, No. 13-CV-43-NJR-DGW, 2015 WL 1379382, at *5 (S.D. Ill. Mar. 24, 2015), *appeal dismissed* (July 16, 2015) ("IDOC and Wexford have diffused responsibility for inmates' medical and dental care so widely among various prison officials and medical personnel that it is difficult to pinpoint who is responsible for seeing that a particular inmate is treated in a timely and appropriate way. . . . Although the Seventh Circuit was heavily critical of the law as it currently stands, it has not been overruled.").

Even assuming Ghosh received and reviewed the three letters Sutton sent him, those three letters do not demonstrate Ghosh's awareness of Lapses 1, 3, or 4, and Sutton's complaints during Lapses 2 and 5 were promptly addressed. Taking the evidence in a light most favorable to Sutton, there is insufficient evidence for a jury to find that Ghosh was deliberately indifferent to Sutton's need for Ibuprofen.

## C.    Qualified Immunity

In view of the Court's ruling that there is not sufficient evidence to support a verdict that Ghosh was deliberately indifferent to the delays Sutton experienced in obtaining Ibuprofen refills, there is no need to address Ghosh's claim to qualified immunity.

## III.    Wexford

Even if Dr. Ghosh, or some other Wexford employee, were individually liable to Sutton for the delays in refilling his Ibuprofen subscriptions, their liability would not give rise to liability on the part of Wexford itself. Under current law, "[a] private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy

or custom of the corporation itself. *Respondeat superior* liability does not apply to private corporations under § 1983." *Shields*, 746 F.3d at 789. To prevail against Wexford, then, Sutton "must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Id.* at 796.

Sutton alleges that Wexford had several unwritten policies condoning and causing medication lapses: (1) a policy to ignore medication lapses; (2) improper cost-cutting; and (3) absence of procedures to ensure timely medication delivery.[15] Resp. at 19-20. The minimal evidence Sutton has presented on this claim consists solely of the testimony of Dr. Dubrick, a staff physician at Stateville and Wexford employee from November 2011 through May 2012, a period that post-dates Ghosh's employment, and the claims in this case, by many months. Not only does Dubrick's testimony concern conversations and observations that occurred after Ghosh's retirement, and thus, after the relevant events at issue here, but his accounts of other inmates' complaints about the difficulties they had obtaining their medications may be inadmissible hearsay that this Court cannot consider on a motion for summary judgment.[16] *See*

---

[15] Defendants fault Sutton for attempting to "expand his 'cost-cutting' claim [as pled in the SAC] into a policy and practice claim" in the response to their summary judgment motion. Reply at 17. Plaintiffs, however, are not required to identify legal theories in their complaints. *See McDonald v. Household Int'l, Inc.*, 425 F.3d 424, 428 (7th Cir. 2005) (*quoting Bartholet v. Reishauer A.G. (Zürich),* 953 F.2d 1073, 1078 (7th Cir. 1992)) ("[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal."). Sutton's complaint adequately notified defendants of the basis of his claim and the later briefs supplied "the legal arguments that bridge the gap between facts and judgments." *Bartholet*, 953 F.2d at 1078.

[16] The evidence of record is insufficient to make a definitive judgment about the admissibility of Dubrick's testimony concerning these comments. Dubrick does not explain the context surrounding the individual inmate complaints he received. *See* PSOF Ex. 4 at 122:14–123:22. To the extent that any of these complaints could be construed as statements of their current conditions, or statements made in order to obtain treatment, or describe past treatment, they could be admissible under Rules 803(3) or 803(4).

*MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment.").[17]

Furthermore, Dubrick's testimony regarding cost-cutting efforts presents no facts but merely an opinion about the state of the health care industry, in general:

> [I]t's the same problems all insurers and healthcare providers have throughout the American healthcare system. . . . I used to have a joke . . . Mr. Wexford is cheap, that's all I can say. It just—they— we say this about all healthcare providers, I suppose, anymore. You know, . . . if they could save a dime, even though it would seem crazy to us on the bottom, they would.

PSOF Ex. 4 at 126:9-11, 127:13-21. This testimony, even when taken in a light most favorable to Sutton, falls well short of establishing that Wexford adopted a policy of cutting costs by refusing to fill prescriptions. *See Olive v. Wexford Corp.*, 494 F. App'x 671, 672-73 (7th Cir. 2012) ("The complaint [ ] asserts that Wexford 'has a bi-coastal policy and practice . . . of denying prison inmates adequate medical care.' That does not identify any concrete policy, let alone an unconstitutional one; it is more in the nature of an insult than the sort of allegation required by *Monell* and [ ] *Twombly*.").

Sutton claims that Wexford failed to implement a procedure to ensure timely medication delivery, as required per its "Pharmacy Policies and Procedures," PSOF ¶ 33, but Wexford points to evidence of monthly quality assurance meetings, the Pharmacy and Therapeutics Committee conversations, and quality improvement studies to rebut that assertion. Reply at 19. Moreover, the evidence of record establishes that Sutton regularly received prescribed medications for his many other ailments on a timely basis and even that he received Ibuprofen in a timely manner up

---

[17] Sutton also points to Ghosh's admission that he heard other inmate complaints that they were not receiving their medications as prescribed. Resp. at 19; DSOF Ex. C at 21:22–22:5. Ghosh then stated that they "listened to those kind of complaints." This exchange does not evidence a policy of ignoring medication lapses.

until August 2010. *See* DSOF ¶¶ 28, 32. There is no basis, then, to infer that Wexford's *de facto* policy was to deny timely prescription refills.

Partly for reasons relating to whether a medical contractor should be able to insulate itself from liability for substandard medical care by diffusing patient responsibility, there is an ongoing debate about whether the exemption of private corporations from *respondeat superior* liability makes sense. This case provides another illustration of the problems that can flow from extending the exemption from *respondeat superior* liability to private corporations that provide contractual services to local entities. Accepting as true Sutton's claims that he fulfilled his responsibilities to request prescription refills, Sutton experienced persistent problems obtaining medication needed to treat a serious medical condition. Yet under current law, which bars claims based on a theory of derivative *respondeat superior* liability, Sutton has no claim against Wexford even though the evidence (again, taking all inferences in Sutton's favor at this juncture) suggests that the problems he experienced were the product of the collective actions of a number of individuals, all of whom were employed by the corporation and acting within the scope of their employment. Similar (though more egregious) situations have prompted some members of the Court of Appeals to question the rationale for extending the *respondeat superior* exemption to private contractors, but the Seventh Circuit has also acknowledged that it will "not apply *respondeat superior* liability under § 1983 to corporations until an intervening on-point Supreme Court decision requires it." *Medrano v. Wexford Health Sources, Inc.*, No. 13 C 84, 2015 WL 4475018, at *7 (N.D. Ill. July 21, 2015) (*citing Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014), *reh'g and suggestion for reh'g en banc denied* (Sept. 9, 2014), *cert. denied*, 135 S. Ct. 1419 (2015)); *see also Hoddenback v. Chandler*, No. 11 C 50348, 2015 WL 1201327, at *2 (N.D. Ill. Mar. 16, 2015) ("[T]he Seventh Circuit was clear that the law of this circuit still

extends *Monell* [and prevents *respondeat superior* liability] from municipalities to private corporations.").

Accordingly, because Sutton has not offered adequate evidence that Wexford has unconstitutional policies condoning medication lapses and has not demonstrated that those alleged policies caused his harm, Wexford is granted summary judgment on this claim.

\*      \*      \*

Although he should not have experienced repeated delays in receiving medically indicated pain medication, Sutton has failed to provide evidence of Ghosh's awareness of and individual responsibility for his medication lapses. Nor did Sutton provide evidence that Wexford has a policy of condoning and causing medication lapses. The defendants' motion for summary judgment is therefore granted.

Dated: September 16, 2015

John J. Tharp, Jr.
United States District Judge